THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:12-cv-00159-FL

| | |
|---|---|
| JESSICA HILL, | ) |
|     Plaintiff/Claimant, | ) ) ) |
| v. | ) ) |
| CAROLYN W. COLVIN, Commissioner of Social Security, | ) ) ) ) |
|     Defendant. | ) ) |

**MEMORANDUM AND RECOMMENDATION**

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-19, DE-21] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Claimant Jessica Hill ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the denial of her application for Supplemental Security Income ("SSI") payments. The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be granted, Defendant's Motion for Judgment on the Pleadings be denied, and the case be remanded to the Commissioner for further proceedings consistent with the Memorandum and Recommendation.

## STATEMENT OF THE CASE

Claimant filed an application for SSI payments on May 22, 2009, alleging disability beginning January 26, 2007. (R. 56, 117). Her claim was denied initially and upon reconsideration. (R. 56, 57). A hearing before the Administrative Law Judge ("ALJ") was held on February 23, 2011, at which Claimant was represented by counsel, and a witness and a

vocational expert ("VE") appeared and testified. (R. 36-55). On March 10, 2011, the ALJ issued a decision denying Claimant's request for benefits. (R. 11-23). On July 6, 2012, the Appeals Council denied Claimant's request for review. (R. 1-5). Claimant then filed a complaint in this Court seeking review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

2

## DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 416.920a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 416.920a(e)(3).

In this case, Claimant alleges the following errors by the ALJ: (1) finding that Claimant's mental impairment does not meet or equal the requirements of Listing 12.05B or 12.05D; and (2) improperly weighing opinion evidence containing internally inconsistent findings not supported by other evidence of record. *See* Pl.'s Mem. at 9-13 [DE-20].

3

# FACTUAL HISTORY

## I. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in substantial gainful employment since the application date. (R. 16). Next, the ALJ determined Claimant had the severe impairments of mild mental retardation. *Id.* However, at step three, the ALJ concluded the impairment was not severe enough to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* In reviewing Claimant's alleged mental impairment and applying the technique prescribed by the regulations, the ALJ found Claimant had "mild restriction" in activities of daily living and social functioning, and "marked difficulties" with regard to concentration, persistence or pace and experienced no episodes of decompensation of an extended duration. (R. 17).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform medium work[1] with the following restrictions: Claimant is able to understand and carry out simple, routine, repetitive tasks in two hour increments; make simple work related decisions; accept supervision and interact with coworkers; adapt to simple changes and avoid hazards; and work in an environment that does not require frequent interpersonal contacts. *Id.* In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 19). At step four, the ALJ concluded Claimant did not have any past relevant work. (R. 22). At step five, upon considering Claimant's age, education, work

---

[1] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If someone can do medium work, she can also do sedentary and light work. 20 C.F.R. § 416.967(c).

4

experience and RFC, the ALJ determined Claimant can perform jobs that exist in significant numbers in the national economy. *Id.*

## II. Claimant's Testimony at the Administrative Hearing

At the time of the administrative hearing, Claimant was 22 years old, unemployed and living with her parents, brother, sister and Claimant's two-year-old son. (R. 40, 42-43). Claimant completed high school, but only received a certificate of attendance, because she could not find a job and, thus, failed to complete the requisite work component. (R. 45-46). Claimant participated in some work programs in high school, but subsequently has not been employed. (R. 44).

Claimant testified that she took special classes in high school and has difficulty reading. (R. 40-41). In school Claimant received assistance with her work, such as having assignments read to her by teachers, and her mother reads and explains any mail she receives and assists her in filling out forms. (R. 41). Claimant has difficulty handling money and could not calculate the correct change if she used a five dollar bill to purchase an item costing three dollars and twenty-five cents. *Id.* Claimant also has memory problems and cannot follow a recipe. (R. 41-42). Claimant does not have a driver's license, because she does not understand the license examination questions. *Id.*

Claimant requires assistance caring for her two-year-old son and is afraid to be home alone with her son. (R. 42-43). Claimant's mother accompanies Claimant to her son's doctor's appointments, because Claimant does not understand what is being said. (R. 42). Claimant's mother also assists with routine tasks caring for Claimant's son, such as feeding, administering

5

medication, and taking him to the bathroom. (R. 43). Claimant's mother handles the laundry and other household chores. (R. 44).

## III.    Claimant's Mother's Testimony at the Administrative Hearing

Claimant's mother, Sherry Hill, testified as follows at the administrative hearing. Claimant was involved in fights at school in ninth and tenth grades and skipped a lot of school in eleventh and twelfth grades, because she did not want to be picked on by her classmates. (R. 46). Claimant can "read a little bit," but does not understand what she reads, and so Hill reads Claimant's mail. *Id.* Claimant passed driver's education in high school, but her teacher read and explained the questions. (R. 51). Claimant could not pass the driver's test to get her license, even if the questions were read to her, because she would not understand the material. (R. 49). Claimant can count small amounts of money, such as quarters or one dollar bills, but cannot count dimes, nickels, or pennies and could not count, for example, a five, three ones, and some change. (R. 47).

Claimant can perform simple tasks that are part of her daily routine, but if asked to do something out of the ordinary, for example, to take chicken out of the freezer and put it in water to thaw, Claimant could not accomplish such a task. *Id.* Claimant can carry out some "very simple" new tasks after two or three attempts if given specific instruction. (R. 47, 51). Claimant is unable to keep house, pay bills, or maintain a budget. (R. 49). Claimant can bathe and clothe her son, but needs significant assistance with feeding, giving medication, or taking him to doctor's appointments. (R. 48). If Claimant's mother is unable to take Claimant to an appointment, a bus picks up Claimant at the house and takes her directly to the doctor's office and back. (R. 50). Claimant's mother would not trust Claimant to use mass transit alone,

6

because Claimant is easily influenced by others and has been taken advantage of in the past. (R. 50).

## IV. Vocational Expert's Testimony at the Administrative Hearing

Paula Day, a vocational rehabilitation consultant, testified as a VE at the administrative hearing. (R. 52-55). The ALJ posed the following hypothetical:

> [A]ssume an individual, of the same age, educational background and work experience as Claimant, consider the effects of the impairments noted in the file and consider that physically this person could perform the full range of medium duties. Based upon a history of suboptimal intellectual functioning, this person could understand and carry out simple, routine, repetitive task in two-hour increments; could make simple work-related decisions; can accept supervision and interact with coworkers. This person likely would work best in environments that did not require frequent interpersonal contact. This person could adapt to simple routine, and avoid hazards. Could this first hypothetical person perform any work that exists in significant numbers in the local, regional or national economy?

(R. 53-54). The VE responded the individual could perform the following unskilled positions with an SVP 2 classification: (1) kitchen helper, DOT # 318.687-010; (2) laundry worker II, DOT # 361.685-018; and (3) hospital cleaner, DOT # 323.687-010. (R. 54).

The ALJ next asked the VE to assume such an individual, but to "fully credit the testimony of the Claimant and her mother . . . giv[ing] them every benefit of the doubt, and giv[ing] the Claimant the benefit of the doubt with regard to anything you've learned in the file about her." (R. 54-55). The VE responded that the additional limitations would preclude all competitive employment. (R. 55).

## DISCUSSION

**I. The ALJ's finding that Claimant's impairment did not meet or equal Listing 12.05.**

7

Claimant contends that the ALJ erred by finding that her impairment does not meet or equal Listing 12.05, the listing for mental retardation.[2] Pl.'s Mem. at 9-12. Claimant bears the burden of demonstrating that her impairments meet or equal a listed impairment. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). Listing 12.05 sets forth a two-part inquiry for determining mental retardation. *See Norris v. Astrue*, No. 7:07-CV-184-FL, 2008 WL 4911794, at *2 (E.D.N.C. Nov. 14, 2008); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. "The first step requires examination of whether a claimant has 'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.'" *Id.* (quoting 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05). "Only if a claimant has 'significantly subaverage general intellectual functioning with deficits in adaptive functioning' which manifested before age 22 does the inquiry move on to whether subparts A, B, C, or D are satisfied." *Id.* Upon making this showing, the claimant must then meet the required severity level of this disorder, which is accomplished by satisfying any one of four categories under Listing 12.05. *Id.*

A.  **Listing 12.05B**

Claimant first contends that she meets listing 12.05B based solely on her Full Scale IQ score of 55. To satisfy Listing 12.05B, Claimant must show both "'significantly subaverage general intellectual functioning with deficits in adaptive functioning' which manifested before the age of twenty-two (22)" and "[a] valid verbal, performance, or full scale IQ of 59 or less."

---

[2] Effective September 3, 2013, the term "mental retardation" will be replaced with "intellectual disability" in the Listing of Impairments. *See* Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46499 (effective Sept. 3, 2013) (to be codified at 40 C.F.R. pt. 404 & 416).

8

*Bennett v. Colvin*, No. 4:12-CV-152-FL, 2013 WL 4417605, at *2, n.2 (E.D.N.C. Aug. 15, 2013) (citations omitted). In support of Claimant's position that an IQ score of 55 alone is sufficient to satisfy Listing 12.05B, she cities internal policy documents of the Social Security Administration and out-of-circuit case law. This court has previously recognized that these sources are "not controlling" and "inconsistent with Fourth Circuit precedent." *Id.* Additionally, substantial evidence supports the ALJ's conclusion that Claimant does not meet Listing 12.05B.

The ALJ did not consider whether Claimant had the requisite deficits in adaptive functioning, because he concluded that she did not meet the severity requirement of Listing 12.05B, i.e., she did not have an IQ score of 59 or less. (R. 16-17). The record indicates that Claimant does have an IQ score below 59 (R. 160), which the ALJ failed to acknowledge (R. 17). However, as the Commissioner points out, this score was obtained in 1995, when Claimant was six years old (R. 160), and later testing from 2007, when Claimant was 18 years old, indicated a verbal score of 65, a nonverbal score of 84, and a composite score of 72 (R. 161). Further IQ testing conducted in 2008, at age nineteen, indicated that Claimant had a verbal score of 68, performance score of 64, and full scale score of 64. (R. 216-17). "[I]ntelligence testing scores do not stabilize until the age of 16, and that testing administered before age 16 is valid for only a short period of time." *See Gibson v. Astrue*, No. 2:10CV00060, 2011 WL 6888532, at *2 (W.D. Va. Dec. 29, 2011) (citing 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00(D)(10) (2011)). Accordingly, any error by the ALJ in failing to acknowledge the 1995 IQ score was harmless in light of more recent scores indicating Claimant's IQ is not below 59 and, thus, insufficient to satisfy Listing 12.05B.

9

## B. Listing 12.05D

Claimant alternatively contends that she meets Listing 12.05D, which requires Claimant to show both "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested . . . before age 22" and "[a] valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05. The first three functional areas are rated on the following scale: None, mild, moderate, marked, or extreme. *See* 20 C.F.R. § 416.920a(c)(4).

The ALJ did not consider whether Claimant had the requisite deficits in adaptive functioning, because he concluded that she did not meet the severity requirement of Listing 12.05D, i.e., Claimant had marked restrictions in maintaining concentration, persistence, or pace, but only mild restrictions in activities of daily living and maintaining social functioning, and no episodes of decompensation. (R. 17). The Claimant specifically takes issue with the ALJ's conclusion that Claimant has only mild restrictions in activities of daily living, and contends that the record supports a finding of marked restrictions in this area of functioning.

The ALJ cited no evidence within the step three analysis for his finding that Claimant had only mild restriction in activities of daily living. (R. 17). However, the ALJ's analysis regarding Claimant's mental impairments is found within the ALJ's RFC discussion. *See Jones v. Astrue*, No. 5:07-CV-452-FL, 2009 WL 455414, at *3 (E.D.N.C. Feb. 23, 2009) (explaining that although "[s]uch collapsing of the analysis of the evidence by an ALJ is not the preferred

form of opinion writing for an ALJ because it makes review of his opinions more difficult, [ ] it is not necessarily reversible error") (citation omitted). The ALJ specifically noted that in 2008, Claimant admitted performing chores, including cleaning, washing dishes, doing laundry, sweeping, making her bed, and fixing lunch and that Claimant enjoyed shopping and going to the movies with her mother. (R. 21). In the ALJ's discussion of the medical evidence, it is noted that Claimant takes care of all her personal needs and spends time with her child and talking on the phone. (R. 19-20). The ALJ also considered Claimant's testimony, although he found it only partially credible, that Claimant could not drive, that she required assistance from her mother with activities such as feeding her son, and that her mother performed all the household chores. (R. 18). Finally, the ALJ considered the testimony of Claimant's mother that Claimant was only able to count small change and bills, was able to bathe and dress her son, but needed assistance at doctor's appointments and administering medication, and that Claimant was able to ride transit transportation, but not public transportation. (R. 19).

A careful review of the record indicates that the ALJ's finding of "mild restrictions in activities of daily living" is not supported by substantial evidence. The Listings provide the framework for evaluating whether a claimant has marked restrictions in activities of daily living:

> A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis. See §§ 404.1520a and 416.920a.
>
> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are

11

> capable of initiating and participating in activities independent of supervision or direction.
>
> We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(C). This narrative is particularly instructive here, where Claimant is noted to perform a number of activities of daily living, but exhibits deficient performance without supervision or is simply unable to perform the activities independently.

For example, the ALJ correctly noted that in 2008, Claimant reported doing a few chores throughout the day and making lunch. (R. 21, 216). However, a closer review of the record reveals that while Claimant can prepare sandwiches and cereal, she cannot follow a recipe or cook a meal, and requires assistance to feed her two-year-old son. (R. 42-43, 48, 198, 201, 203, 244, 263). Dr. Daniel Nelson, who performed a mental residual functional capacity assessment in July 2010, noted that Claimant could care for her personal needs and her child with "some assistance" and "do some household chores [with] some assistance . . . ." (R. 263). Dr. Nelson, as well as Dr. Keith Noles, opined that Claimant had moderate restrictions in activities of daily living (R. 229, 257), and the ALJ attributed great weight to Nelson's opinion and significant weight to Noles's opinion (R. 21), yet still found Claimant to have only mild restrictions in this area.

Claimant lives with her family and received significant assistance from her mother with activities of daily living. It is undisputed that Claimant is unable to manage her finances (R. 218), and Claimant requires the assistance of her mother when shopping, because Claimant has

12

difficulty calculating change and can only count small amounts of money, i.e., a few quarters or dollar bills (R. 41, 46-47, 199). *See French v. Astrue*, No. 7:12-CV-33-BO, 2013 WL 447296, at *4 (E.D.N.C. Feb. 5, 2013) (finding inability to manage finances without help is evidence of marked restrictions in activities of daily living and the ability to complete some activities of daily living does not preclude such a finding). Claimant's inability to handle money is consistent with her poor math skills, as evidenced by her inability to do simple calculations such as adding twelve plus ten, which Claimant calculated as seventy-one (R. 244). Claimant's mother reads and explains Claimant's mail to her (R. 46), and Dr. James Frazier diagnosed Claimant with "Probable minimal literacy" (R. 217). Claimant's mother administers medication to Claimant's child and accompanies Claimant to the child's doctor's appointments, because Claimant does not understand the doctor. (R. 42). Claimant has not obtained a driver's license because she is unable to comprehend the test questions (R. 41-42, 48-49) and passed driver's education in high school only by having test questions read and explained to her (R. 51). Claimant cannot fill out job applications without the assistance of her mother and, despite attempts, has never been employed. (R. 45-46).

In sum, while Claimant engages in activities of daily living at a superficial level, substantial evidence in the record indicates that Claimant cannot successfully perform these functions independently on a daily basis and, thus, experiences marked restrictions in her activities of daily living. Accordingly, the ALJ's finding that Claimant suffers only mild restrictions in activities of daily living was error. Therefore, having concluded that Claimant satisfies the severity prong of Listing 12.05D, i.e., has a valid verbal, performance, or full scale IQ of 60 through 70, resulting in marked restriction of activities of daily living and marked

13

difficulties in maintaining concentration, persistence, or pace, it must be determined whether Claimant satisfies the adaptive functioning prong, i.e., has deficits in adaptive functioning initially manifested before age 22. The ALJ did not reach this issue and should be provided the opportunity to so consider. Accordingly, it is recommended that this case be remanded for the ALJ to determine whether Claimant's mental impairment fully satisfies Listing 12.05D.

## CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings be GRANTED, Defendant's Motion for Judgment on the Pleadings be DENIED, and the case be REMANDED to the Commissioner for further proceedings consistent with the Memorandum and Recommendation.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

Submitted, the 30th day of August 2013.

Robert B. Jones, Jr.
United States Magistrate Judge

14

Case 4:12-cv-00159-FL   Document 23   Filed 08/30/13   Page 14 of 14